UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:12-CV-00140-JHM

STEVE WEST, Individually, and
THE ESTATE OF MARILYN WEST,
by and through Steve West,
Administrator of the Estate of Marilyn West                     PLAINTIFFS

V.

DR. ROBERT F. HUXOL and
OWENSBORO MEDICAL HEALTH
SYSTEM, INC.                                                                 DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a renewed motion for summary judgment by Defendant Owensboro Medical Health System, Inc. ("OMHS") [DN 56] and a renewed motion for summary judgment by Defendant Dr. Robert F. Huxol ("Dr. Huxol") [DN 60]. Fully briefed, these matters are ripe for decision. For the following reasons, the motions for summary judgment are **GRANTED**.

## I. BACKGROUND

On December 2, 2011, Marilyn West presented to Breckinridge Memorial Hospital in Hardinsburg, Kentucky, with complaints of respiratory distress. (Breckinridge Health, Inc. Emergency Room Record [DN 56-3, 60-2].) She was treated by Dr. Gregory A. West[1] ("Dr. West"), an emergency room physician at Breckinridge Memorial. (Id.) Approximately five minutes after arriving at Breckinridge Memorial, Mrs. West went into respiratory arrest. (Breckinridge Mem'l Hosp. Triage Sheet [DN 56-4, 60-2].) She was unable to be intubated on multiple attempts; therefore she had a King esophageal obturator airway placed in an effort to

---

[1] No relation to either Mrs. West or her husband, Steve.

stabilize her airway.  (See Emergency Dep't Note by Dr. Gregory A. West [DN 56-11, 60-2] 1; Breckinridge Health, Inc. Progress Record [DN 56-5, 60-2] 1.)  "After her airway was established a pulse and pressure returned." (Emergency Dep't Note [DN 56-11, 60-2] 1.)

Her temporary stabilization notwithstanding, it was apparent to Dr. West that Mrs. West needed sophisticated airway management, care that Breckinridge Memorial was not able to provide, so Dr. West sought to transfer Mrs. West to a hospital that could provide a higher level of care.  (See Dr. West Dep. [DN 60-3] 36:13–:25, June 24, 2014.)  According to the Emergency Department Note by Dr. West,

> The OMHS call center was initially consulted and [sic] at 1530 and Dr. Huxol advised transfer to a tertiary care center in Louisville.  The University of Louisville call center was consulted at 1546 advised they would call back.  The Norton's infirmary transfer Center was consulted at 1613, the cardiologist recommended consultation with the patient's cardiologist prior to transfer care for concerns about continuity of care.  The OMHS call center was consulted again at 1620 and rate [sic] her heart specialist were consulted [sic].  Dr. Garimella accepted transfer at 1632.

(Emergency Dep't Note [DN 56-11, 60-2] 1–2.)

Because Mrs. West had been to OMHS before and her family expressed some interest in going back there, Dr. West first contacted the emergency department at OMHS, via a call center, and was connected with Dr. Huxol.  (See Dr. West Dep. [DN 60-3, 60-5] 31:1–38:23.)  Dr. West and Dr. Huxol discussed Mrs. West and Dr. West's difficulty establishing an airway with her, (Dr. Huxol Dep. [DN 60-6, 60-7] 34:12–37:1, Oct. 15, 2013), and the determination was made that University of Louisville Hospital was the best option for transfer, (see Dr. West Dep. [DN 60-3] 33:18–34:1, 35:23–36:3, 36:12–38:23).  Dr. West elaborated in his deposition about his phone conversation with Dr. Huxol: "Dr. Huxol and I discussed the case, and we both agreed that this probably wasn't an appropriate transfer to [OMHS], and that I needed to talk to University.  And I also talked to the Norton's Hospital because Norton's group manages this

2

hospital. Most of our transfers go to Norton's, but we don't usually send them extreme emergencies like this because University really is the appropriate place," (id. [DN 60-5] 33:18–34:1), "there [was] an interaction as to whether or not it [was] an appropriate transfer, and Dr. Huxol and I both agreed that probably University Hospital would be a better place for her," (id. 35:25–36:3), but "[Dr. Huxol] did say, if you have problems call me back and, you know, we will make whatever accommodations we can," (id. [DN 60-3] 38:9–:11).

When asked about his statement in the Emergency Department Note that "Dr. Huxol advised transferred to a tertiary care center in Louisville," Dr. West stated "Yes. That was not his decision. That's a decision we came to together because like I -- I was still fairly new to this area and was not used to transferring to OMHS, and we discussed what was reasonable care that could be delivered there and we both knew that University was a little bit further, but they had more -- a wider range of services available." (id. [DN 60-3] 37:20–:25.) Both Dr. West and Dr. Huxol testified in their depositions that Dr. Huxol never refused to accept transfer of Mrs. West. (Dr. Huxol Dep. [DN 56-7, 60-6] 34:9–35:19; Dr. West Dep. [DN 56-6, 60-5] 69:3–:5, 75:10–76:5; see also Dr. West Aff. [DN 60-4] ¶¶ 5–7, Jan. 22, 2014.)

Subsequent to the call between Dr. West and Dr. Huxol, Dr. West contacted University of Louisville Hospital regarding transfer. (Dr. West Dep. [DN 60-3] 38:20–:23 ("[A]fter I talked with [Dr. Huxol], and we'd determined that a tertiary care facility, you know, probably University, would be the best option for her then I tried the University Hospital Call Center.").) After having difficulty with University Hospital, Dr. West consulted Norton Hospital, who referred him back to OMHS. (Id. [DN 60-3] 39:9–40:6, [DN 60-5] 41:11–42:15.) Dr. West then contacted OMHS a second time and was connected with Dr. Garimella, a cardiologist, who accepted her transfer immediately. (Id. [DN 60-5] 42:15–:23.) Mrs. West was transferred to

OMHS that day. She never regained consciousness, was placed on life support, and passed away on December 7, 2011. (See OMHS Discharge Summary, Dec. 7, 2011 [DN 56-8] 1–2.)

On November 29, 2012, Steve West, individually and as administrator of the Estate of Marilyn West (collectively "Plaintiffs"), brought this wrongful death action in Daviess Circuit Court against Dr. Huxol and OMHS. (See Compl. [DN 1-1].) In their Complaint, Plaintiffs assert claims against Defendants for violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and deviation from the applicable standard of care (medical negligence claim), for Dr. Huxol's alleged refusal, on behalf of OMHS, to accept transfer of Mrs. West from Breckinridge Memorial. (See id.) Plaintiff Steve West, individually, also asserts a claim for loss of consortium arising out of his wife's allegedly wrongful death. (See id. ¶ 18.) On December 27, 2012, OMHS, with consent of Dr. Huxol, removed the action from Daviess Circuit Court to this Court on the basis of federal question jurisdiction, 28 U.S.C. § 1331. (See Removal Notice [DN 1].)

On January 1, 2014, OMHS [DN 30] and Dr. Huxol [DN 31] moved for summary judgment. The Court, by order dated April 9, 2014, denied those motions with leave to refile at the close of discovery [DN 44]. Both OMHS [DN 56] and Dr. Huxol [DN 60] have filed renewed motions for summary judgment, which are presently before the Court.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the

moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

### III. DISCUSSION

Plaintiffs allege in their Complaint that Dr. Huxol and OMHS deviated from the applicable standard of care and violated EMTALA, 42 U.S.C. § 1395dd, when they allegedly refused to accept transfer of Mrs. West as a patient to their facility. The Court addresses each claim in turn.

### A. EMTALA Claim

Plaintiffs assert that Defendants violated EMTALA when Dr. Huxol, acting on behalf of OMHS, allegedly refused to accept transfer of Mrs. West from Breckinridge Memorial to OMHS. Dr. Huxol contends he is entitled to judgment as a matter of law with respect to Plaintiffs' EMTALA claim because EMTALA does not authorize a private right of action

against individuals. Both Defendants move for summary judgment on the ground that there is an absence of a genuine dispute of material fact related to whether Dr. Huxol ever refused to accept transfer of Mrs. West and the undisputed evidence shows that Dr. Huxol never refused to accept transfer of Mrs. West.[2]

    **1.** *No Private Cause of Action under EMTALA against Individuals*

EMTALA provides a private cause of action directly against participating hospitals[3] for violation of the duties created by the statute, 42 U.S.C. § 1395dd(d)(2)(A) (authorizing private suits "against the participating hospital"). However, courts, including the Sixth Circuit, have held that EMTALA does not provide a plaintiff with a private cause of action against a physician. Moses v. Providence Hosp. & Med. Ctrs., Inc., 561 F.3d 573, 587 (6th Cir. 2009) ("EMTALA does not authorize a private right of action against individuals."); see Eberhardt v. City of L.A., 62 F.3d 1253, 1256–57 (9th Cir. 1995) (holding that EMTALA does not allow private suits against physicians); King v. Ahrens, 16 F.3d 265, 271 (8th Cir. 1994) (same); Delaney v. Cade, 986 F.2d 387, 393–94 (10th Cir. 1993) (holding plain language of Act provides cause of action only against participating hospitals); Baber v. Hosp. Corp. of Am., 977 F.2d 872, 877–78 (4th Cir. 1992) (holding that EMTALA does not give patients a private cause of action against their physicians); Gatewood v. Wash. Healthcare Corp., 933 F.2d 1037, 1040 n.1 (D.C. Cir. 1991) (dictum) (no private cause of action against physicians under the Act). In their response brief, Plaintiffs "acknowledge the holding of the Moses case, as to a cause of action for

---

  [2] OMHS alternatively argues that even if there was such a refusal, OMHS had no obligation under EMTALA to accept transfer of Mrs. West because she had not yet "come to" OMHS at the time of the alleged refusal, (see Def. OMHS's Renewed Mot. Summ. J. [DN 56] 1–2), relying on the "[i]n the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department" language in § 1395dd(a). Because the Court finds, on the record before it, that there was no such refusal, it need not address this alternative argument.

  [3] A "participating hospital" is a hospital that participates in Medicare (has executed a Medicare provider agreement with the federal government). See 42 U.S.C. §§ 1395dd(e)(2), 1395cc.

6

an EMTALA claim against Dr. Huxol." (Pls.' Resp. to Def. Huxol's Renewed Mot. Summ. J. & Def. OMHS's Renewed Mot. Summ. J. [DN 65] 11.) Because it is apparent, in light of the clear terms of the statute and applicable case law, that Plaintiffs have no private cause of action against Dr. Huxol, an individual physician, under EMTALA, the Court concludes that Dr. Huxol is entitled to judgment as a matter of law. Accordingly, the Court grants summary judgment dismissing Plaintiffs' claim against Dr. Huxol.

### 2. *Dr. Huxol and OMHS Never Refused to Accept Transfer of Mrs. West*

EMTALA contains a "nondiscrimination" provision, which provides that:

> A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

42 U.S.C. § 1395dd(g); see 42 C.F.R. § 489.24(f). This is known as the "reverse-dumping" provision. See St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs., 309 F.3d 680, 686 (10th Cir. 2002).[4] There is apparently no dispute that OMHS is a participating hospital that has specialized capabilities or facilities,[5] that Mrs. West was an individual who required such specialized capabilities or facilities, and that OMHS had the capacity to treat Mrs. West. The material fact at issue here is whether Dr. Huxol, acting on behalf of OMHS, refused to accept an appropriate transfer of Mrs. West.

---

[4] "'Reverse-dumping' occurs when a hospital emergency room refuses to accept an appropriate transfer of a patient requiring its specialized capabilities. By contrast 'patient-dumping' is the emergency-room practice of refusing to accept or treat individuals who do not have medical insurance." St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs., 309 F.3d 680, 686 (10th Cir. 2002).

[5] According to Dr. Huxol's deposition testimony, OMHS is a "regional referral center." (See Dr. Huxol Dep. [DN 60-6] 35:8–:23.) See also 42 C.F.R. §§ 489.24(f) (defining "regional referral centers" "for purposes of this subpart, [to] mean hospitals meeting the requirements of referral centers found at § 412.96 of this chapter"), 412.96 (setting forth criteria for classification as a referral center).

Plaintiffs allege in their Complaint that Dr. Huxol, on behalf of OMHS, refused to accept the transfer of Mrs. West, apparently during the telephone conversation between Dr. West and Dr. Huxol.  (See Compl. [DN 1-1] ¶¶ 8–9.)  Defendants move for summary judgment on Plaintiffs' EMTALA claim arguing that they are entitled to judgment as a matter of law because there is no evidence that Dr. Huxol refused to accept transfer of Mrs. West and thus Plaintiffs cannot establish an essential element of the claim.  Defendants assert that Plaintiffs have no evidence to create a genuine dispute as to the material fact of whether Dr. Huxol, acting as an agent of OMHS, refused to accept transfer of Mrs. West, as discovery is complete and the undisputed evidence of record shows that Dr. Huxol never refused to accept transfer of Mrs. West.  In support of their motions, Defendants cite to the Emergency Department Note, the deposition testimony of Dr. Huxol and Dr. West, and the affidavit of Dr. West.  According to that evidence, which is not contradicted by other evidence, Dr. Huxol never refused to accept the transfer of Mrs. West.  The Emergency Department Note states merely that Dr. West consulted OMHS and "Dr. Huxol advised transfer to a tertiary care center in Louisville."  (See Emergency Dep't Note [DN 56-11, 60-2, 65-1] 1–2.)  Dr. West testified in his deposition and averred in his affidavit that Dr. Huxol never refused to accept transfer of Mrs. West.  (Dr. West Dep. [DN 56-6, 60-5] 69:3–:5, 75:10–76:5; Dr. West Aff. [DN 60-4] ¶¶ 5–7.)  Dr. Huxol confirmed, under oath, that he made no such refusal.  (Dr. Huxol Dep. [DN 56-7, 60-6] 34:9–35:19.)

The Court finds that Defendants have met their burden, sufficiently showing an absence of a genuine dispute of material fact as to whether Dr. Huxol, acting on behalf of OMHS, ever refused to accept the transfer of Mrs. West from Breckinridge Memorial to OMHS.  The burden therefore shifts to Plaintiffs to come forward with "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 322–23.  "[T]here is no issue for trial unless there is

8

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted). Plaintiffs may not rest on the mere allegations of their pleadings in an effort to sustain the burden. Fed. R. Civ. P. 56(e)(2), (3), (c); see Anderson, 477 U.S. at 249–52 (allegations are not specific facts required by Fed. R. Civ. P. 56(e) and will not defeat properly made summary judgment motion).

Plaintiffs rely exclusively on the Emergency Department Note for their assertion that "from the medical record it is clear that OMHS initially denied [Mrs. West's] transfer." (See Pls.' Resp. [DN 65] 1–2.) That document provides in pertinent part: "The OHMS call center was initially consulted and [sic] at 1530 and Dr. Huxol advised transfer to a tertiary care center in Louisville." (Emergency Dep't Note [DN 56-11, 60-2, 65-1] 1–2.) Plaintiffs argue that this is undisputed evidence of Dr. Huxol and OMHS refusing to accept transfer of Mrs. West. The Emergency Department Note, however, does not state that Dr. Huxol refused transfer. Plaintiffs argue that "[j]ust because Dr. Huxol did not use the word 'refused' does not make it any less of a refusal." (Pls.' Resp. [DN 65] 11.) While all reasonable inferences are to be drawn in favor of Plaintiffs as the non-moving party, Anderson, 344 U.S. at 255, it is not a reasonable inference to conclude that "OMHS initially denied [Mrs. West's] transfer," and thus refused appropriate transfer of Mrs. West. The only individuals with personal knowledge of whether there was a refusal to accept transfer—Dr. West and Dr. Huxol—both testified that Dr. Huxol never refused to accept transfer of Mrs. West, which expressly refutes Plaintiffs' allegation and proffered interpretation of the Note. (See Dr. West Dep. [DN 56-6] 75:10–76:5 (Dr. Huxol never refused to accept transfer of Mrs. West); id. at 69:3–:5 (no one at OMHS refused to accept transfer of Mrs. West); Dr. Huxol Dep. [DN 56-7] 34:10–35:19 ("Never once did I refuse to take this

transfer. Never once. . . . . It is my business to accept patients at this facility."); Dr. West Aff. [DN 60-4] ¶¶ 5–7 ("Dr. Huxol never refused to accept the transfer of Ms. West from Breckinridge Memorial Hospital to Owensboro Health, Inc.").) The evidence here does not present a sufficient disagreement to require submission to a jury, but instead "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52. Thus, the Court finds that Plaintiffs have not sufficiently produced facts showing a genuine dispute of fact for trial concerning whether Dr. Huxol, acting on behalf of OMHS, refused to accept transfer of Mrs. West.

The record demonstrates that Dr. Huxol, acting on behalf of OMHS, did not refuse to accept an appropriate transfer of Mrs. West from Breckinridge Memorial. Thus, Defendants are entitled to judgment as a matter of law because Plaintiffs cannot demonstrate an essential element of their reverse-dumping EMTALA claim. Accordingly, the Court grants summary judgment dismissing Plaintiffs' EMTALA claim.

## B. Medical Negligence Claim

In their Complaint, Plaintiffs allege that "both [Defendants] deviated from the applicable standard of care thereby denying Mrs. West lifesaving treatment," (Compl. [DN 1-1] ¶ 13), when "Dr. Huxol, and Owensboro Medical Health System, Inc. refused to accept [Mrs. West's] transfer as a patient to their facility," (id. ¶ 9).

### 1. *Dr. Huxol Did Not Have a Physician-Patient Relationship with Mrs. West*

Plaintiffs contend that Dr. Huxol "committed malpractice/medical negligence in the failure to accept Mrs. West's immediate transfer to OMHS." (Pls.' Resp. [DN 65] 10.) Defendants contend that Dr. Huxol never had a physician-patient relationship with Mrs. West, and therefore Dr. Huxol owed no legal duty to Mrs. West. "A medical negligence case, like any negligence case, requires proof that: (1) the defendant owed the plaintiff a duty of care; (2) the

defendant breached the standard by which his or her duty is measured; and (3) consequent injury." Jenkins v. Best, 250 S.W.3d 680, 688 (Ky. Ct. App. 2007). The threshold issue here is whether Dr. Huxol owed Mrs. West a duty of care. Whether a defendant owes the plaintiff a duty of care is a question of law. Id. (quoting Pathways, Inc. v. Hammons, 113 S.W.3d 85, 89 (Ky. 2003)). "If no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence." Id. (quoting Ashcraft v. Peoples Liberty Bank & Tr. Co., 724 S.W.2d 228, 229 (Ky. Ct. App. 1986)).

In medical negligence cases, the duty owed by the physician arises from the physician-patient relationship. Id. Accordingly, a physician-patient relationship is a legal prerequisite to an action for medical negligence against a physician. Id.; see St. John v. Pope, 901 S.W.2d 420, 423–24 (Tex. 1995) ("[W]e agree with those cases that hold that the duty to treat the patient with proper professional skill flows from the consensual relationship between the patient and physician, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice."). The key issue in determining the existence of a physician-patient relationship, for purposes of establishing the physician's duty to the patient, is whether the physician, expressly or impliedly, agreed to treat the patient. Jenkins, 250 S.W.3d at 688 ("The physician's duty to a patient arises when, by his words or deeds, 'he agrees to treat a patient, thus establishing a physician/patient relationship.'" (quoting Noble v. Sartori, 799 S.W.2d 8, 9 (Ky. 1990) (emphasis omitted))). Thus, the issue here is whether Dr. Huxol, by his words or deeds, agreed to treat Mrs. West, thus establishing a physician-patient relationship. If he did not, then Dr. Huxol owed no duty to Mrs. West and he is entitled to judgment as a matter of law on Plaintiffs' medical negligence claim.

Dr. Huxol, relying on Jenkins v. Best, contends that he owed no duty to Mrs. West because he never agreed to treat her, thus no physician-patient relationship was established. In Jenkins, Dr. Best was a perinatologist[6] who was on call during the evening and overnight at Baptist Hospital. 250 S.W.3d at 683. Ms. Jenkins went to Baptist Hospital, complaining of abdominal pain and vaginal bleeding while pregnant. Id. Ms. Jenkins' nurse, after consultation with Dr. Farmer, the general obstetrician who saw Ms. Jenkins that evening, called Dr. Best and asked her to perform an ultrasound. Id. at 684. Dr. Best responded that she could not do the ultrasound that night, but may be able to the next morning. Id. Later that same night, following Dr. Best's conversations with the nurses to schedule the ultrasound, Ms. Jenkins developed additional complications and was transferred to Norton Hospital for a complete obstetrical ultrasound to be performed that night. Id. The next morning, Ms. Jenkins delivered a child who suffered severe health issues and subsequently passed away. Id. Dr. Best was sued, along with other defendants, for medical malpractice. Id. Dr. Best moved for summary judgment, arguing that she never had a physician-patient relationship with Ms. Jenkins, therefore owed no duty to Ms. Jenkins, and was entitled to judgment as a matter of law. Id. at 685. The trial court entered summary judgment in favor of Dr. Best, which was affirmed by the Kentucky Court of Appeals. Id. That court found no physician-patient relationship was established, and thus no duty owed to Ms. Jenkins, on the following undisputed facts:

> While Jenkins was in Baptist Hospital, Dr. Best was at another location and therefore never available to offer medical assistance. Dr. Best never saw or examined Jenkins, never spoke to her or consulted or gave her advice. Dr. Best never reviewed Jenkins' chart or made any entry in it. Dr. Best never consulted with Dr. Farmer while Jenkins was under his care. Dr. Best never issued either medical or nonmedical orders. Nor did she render any opinions or recommendations. She did not participate in Jenkins' diagnosis or treatment. The

---

[6] "Perinatology is a subspecialty of obstetrics concerned with the care of the mother and fetus during pregnancy, labor, and delivery, particularly when the mother or fetus is at high risk for complications." Jenkins v. Best, 250 S.W.3d 680, 682 n.2 (Ky. Ct. App. 2007) (citing Steadman's Medical Dictionary 1549 (28th ed. 2006)).

12

> extent of her involvement was to inform Baptist Hospital nurses that she was unavailable to perform an ultrasound until the morning of March 29, 2003. In summary, Dr. Best did nothing that constitutes an undertaking to render medical care to Jenkins.

Jenkins, 250 S.W.3d at 688.

Dr. Huxol asserts that he "never saw Ms. West, never examined Ms. West, never reviewed any medical records concerning Ms. West, never spoke to Ms. West, nor gave Ms. West any medical advice." (Def. Huxol's Mem. Supp. Summ. J. [DN 60-1] 5 (citing Dr. Huxol Dep. [DN 60-7] 38:24–39:2); see also Dr. Huxol Dep. [DN 60-7] 29:17–:18, 48:1–:7.) "Dr. Huxol was not even consulted when Ms. West was ultimately transferred to Owensboro Health. He did not give any orders and did not participate, in any way, in the diagnosis and treatment of Ms. West." (Def. Huxol's Mem. Supp. Summ. J. [DN 60-1] 5 (citing Dr. Huxol Dep. [DN 60-7] 31:19–32:12, 42:16–:21; 44:21–45:1).) "Most notably, Dr. Huxol testified that he did not render any medical care to Ms. West." (Id. (citing Dr. Huxol Dep. [DN 60-8] 48:1–:7).) Dr. Huxol argues that "[a]t most, [he] simply agreed with Dr. West that the best option was to involve the University of Louisville. Dr. Huxol was far less involved in Ms. West's care than Dr. Best was in Jenkins. . . . As in Jenkins, Plaintiffs' claim against Dr. Huxol should be dismissed since Dr. Huxol did nothing that constituted 'an undertaking to render medical care' to Ms. West and therefore failed to establish a physician-patient relationship." (Id.)

Plaintiffs argue that "[t]he Court needs to look no further than the testimony of Dr. Garimella and Dr. Cummins to determine that Dr. Huxol owed a duty to Mrs. West." (Pls.' Resp. [DN 65] 11.) However, nothing in the "summary" of deposition testimony of these two doctors, set forth in Plaintiffs' brief, supports a finding that a physician-patient relationship was established between Dr. Huxol and Mrs. West. Instead, this testimony appears to go to what would be the applicable standard of care owed by Dr. Huxol if it was first established that Dr.

13

Huxol owed any such duty to Mrs. West. While a plaintiff alleging medical malpractice is generally required to put forth expert testimony to establish the applicable medical standard of care and to show that the defendant medical provider failed to conform to that standard of care, see Blankenship v. Collier, 302 S.W.3d 665, 670–71 (Ky. 2010), "[s]uch considerations only arise after a physician-patient relationship imposing a duty has been found to exist," Reynolds v. Decatur Mem'l Hosp., 660 N.E.2d 235, 239 (Ill. App. Ct. 1996). That is, "the question of duty is a question of law which must be decided before the issue of standard of care arises." St. John, 901 S.W.2d at 424. Accordingly, Plaintiffs' reliance, for the purpose of determining whether a duty was owed, on the testimony of Dr. Garimella and Dr. Cummins regarding the applicable standard of care and whether there was a breach of that standard is misplaced.

Plaintiffs also contend that "Dr. Huxol undertook a part, albeit abbreviated, in the care of Mrs. West." (Pls.' Resp. [DN 65] 11.) In support of their contention, Plaintiffs state "[e]ven Dr. Huxol admitted he gave suggestions to Dr. West as to treatment options." (Id. at 11–12.) Dr. Huxol asserts that Plaintiffs, in stating that Dr. Huxol "gave suggestions to Dr. West as to treatment options," "failed to provide any insight into when or how Dr. Huxol agreed to treat or otherwise undertake treatment of Ms. West." (Def. Huxol's Reply Supp. Summ. J. [DN 67] 2–3.) Dr. Huxol further asserts that Plaintiffs do not "cite any evidence to establish a physician-patient relationship was established." (Id. at 3.)

The Court agrees with Dr. Huxol and finds that no physician-patient relationship was established between Dr. Huxol and Mrs. West because Dr. Huxol did not, expressly or impliedly, agree to treat Mrs. West. Dr. Huxol's "involvement" with Mrs. West's case was limited to his telephone conversation with Dr. West, in which they had a "brainstorming session" about how Dr. West might be able to stabilize Mrs. West's airway to allow her to be transported. (See Dr.

Huxol Dep. [DN 56-7, 60-6] 34:9–35:19.) A physician-patient relationship can exist where other persons contact the physician on behalf of the patient, but this is not a case in which Dr. Huxol was asked to provide a service for Mrs. West, conduct laboratory tests, or review test results. See Reynolds, 660 N.E.2d at 239. Dr. Huxol did nothing more than answer an inquiry from a colleague. Contrary to Plaintiffs' contention, Dr. Huxol "g[iving] suggestions to Dr. West as to treatment options" is not, without more, sufficient to give rise to a physician-patient relationship between Dr. Huxol and Mrs. West. See Hill v. Kokosky, 463 N.W.2d 265, 266–67 (Mich. Ct. App. 1990) (a treating physician's solicitation of a doctor's informal opinion is not, without more, sufficient to give rise to a physician-patient relationship between the patient and doctor consulted). "A doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed." Reynolds, 660 N.E.2d at 239 (holding that no physician-patient relationship between doctor who gave informal opinion over telephone at request of treating physician and minor patient whose case was discussed, and thus doctor did not owe duty of care to patient); St. John, 901 S.W.2d at 424 (holding that on-call physician, consulted by emergency room physician over telephone, did not form physician-patient relationship by expressing his opinion that patient should be transferred to another facility); Hill, 463 N.W.2d at 266–67 (holding that doctor who was contacted by patient's treating physician to discuss treatment alternatives does not owe duty of care to patient whose case is discussed, such as would support medical malpractice claim); Lopez v. Aziz, 852 S.W.2d 303, 305–07 (Tex. App. 1993) (holding that obstetrician who consulted with patient's treating physician by telephone was not in physician-patient relationship and, therefore, owed no duty to patient; obstetrician did no more than answer professional inquiry of colleague and did not contact, examine, or treat patient).

15

Based on the record, the Court finds that Dr. Huxol said nothing and did nothing that would establish a physician-patient relationship between him and Mrs. West. Accordingly, Dr. Huxol owed no duty to Mrs. West and Dr. Huxol is entitled to judgment as a matter of law on Plaintiffs' medical negligence claim.

### 2. *No Actionable Claim for Medical Negligence Exists against OMHS*

Plaintiffs' medical negligence claim against OMHS in this action is premised upon the alleged actions of Dr. Huxol, acting as an agent of OMHS. Since no physician-patient relationship existed between Dr. Huxol and Mrs. West, neither Dr. Huxol nor his employer OMHS owed a duty to Mrs. West and, thus, no actionable claim for medical negligence exists. Furthermore, as discussed previously, there is no genuine dispute of fact regarding the act alleged as a breach of the applicable standard of care—whether Dr. Huxol, acting on behalf of OMHS, refused to accept transfer of Mrs. West. The undisputed record reflects no such refusal occurred. For these reasons, summary judgment on Plaintiffs' medical negligence claim is appropriate.

### C. Loss of Consortium Claim

Plaintiff Steve West, individually, also asserts a claim for loss of consortium resulting from his wife's allegedly wrongful death. (See Compl. [DN 1-1] ¶ 18.) A loss of consortium claim "is derivative in nature, arising out of and dependent upon the right of the injured spouse to recover." McDaniel v. BSN Med., Inc., No. 4:07-CV-00036, 2010 WL 4779767, at *4 (W.D. Ky. Nov. 16, 2010) (quoting Floyd v. Gray, 657 S.W.2d 936, 941 (Ky. 1983) (Leibson, J., dissenting)). As set forth above, Defendants are entitled to summary judgment on the claims of the Estate of Marilyn West, and therefore, are equally entitled to summary judgment on the claim for loss of consortium asserted by Steve West. See Ford v. Pizza Hut of Se. Kansas, Inc., No.

4:13CV-00015-JHM, 2013 WL 4500090, at *4 (W.D. Ky. Aug. 20, 2013); Stamper v. Stainless Steel Invest, Inc., No. 3:11-CV-00069-EBA, 2012 WL 2590353, at *5–6 (E.D. Ky. July 3, 2012).

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Owensboro Medical Health System, Inc.'s Renewed Motion for Summary Judgment [DN 56] and Dr. Robert F. Huxol's Renewed Motion for Summary Judgment [DN 60] are **GRANTED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

September 23, 2015

cc: Counsel of Record